OPINION
RENDELL, Circuit Judge:
The issue before us is straightforward: does Columbia Gas Transmission, LLC (“Columbia”), have the right of eminent *303 domain to obtain easements over the land of objecting landowners, outside of the existing right of way, in order to replace deteriorating pipeline? The answer is equally straightforward and clear: yes.
The regulatory authority given to natural gas companies such as Columbia actually anticipates replacement outside the existing right of way as we discuss below, and contains no adjacency requirement. The issue before us, then, whether Columbia has a right to replace the pipeline outside of the existing right of way, is actually a non-issue. But, the District Court put a peculiar “spin” on the regulations in question, finding them to be ambiguous by adopting its own definition of “replace” and concluding that a “notice” of “proposed rulemaking” for “Emergency Reconstruction of Interstate Natural Gas Facilities” promulgated by the Federal Energy Regulatory Commission (“FERC”) after 9/11 should somehow be viewed as resolving this ambiguity in the law. Our dissenting colleague adopts this argument. However, we suggest that the statute and regulations are clear and the case before us is easily resolved.
Columbia, an interstate natural gas company subject to the jurisdiction of FERC, seeks to replace a portion of a natural gas pipeline (“Line 1655”) that runs in and around York County, Pennsylvania. Because the original location of the pipeline has become heavily populated, the replacement will not track the original line but instead will be outside the existing right of way. (App.27.)[1] In an effort to obtain easements necessary to complete construction of the replacement, in March 2013, Columbia filed Complaints in Condemnation against four land-owning couples (the “Landowners”) in federal court. In May 2013, Columbia filed motions for partial summary judgment and for preliminary injunctions to acquire immediate possession of the easements. In June 2013, the Landowners also filed motions for summary judgment. The District Court subsequently denied Columbia’s motions and granted the Landowners’ motions, holding that Columbia did not have the right of eminent domain required to condemn the easements. The District Court’s conclusion rested on the determination that the relevant FERC regulation, 18 C.F.R. § 157.202(b)(2)(i), was ambiguous. As a result, the Court looked outside the regulations to a sentence in a notice of proposed rulemaking that it concluded set forth the agency interpretation. This was a mistake. The language of the governing regulations could not be more clear. For the reasons set forth below, we will reverse the judgments of the District Court.[2]
1. Background
Line 1655 is over fifty years old, and Columbia asserts that portions of the pipeline must be replaced to meet safety standards established by the Pipeline and Hazardous Materials Safety Administration. Columbia has already replaced 19,000 feet — or 95% — of the pipeline but has been stalled in replacing the last 1,000 feet be *304 cause it lacks the remaining necessary-easements — that is, the easements on and across the Landowners’ properties. Columbia attempted to obtain these easements through negotiation, as it had the others it needed, but was unsuccessful.[3] Accordingly, Columbia filed a complaint in the District Court, seeking condemnation of the remaining easements to which it was entitled pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h). Before addressing the District Court’s disposition of the case, we will set forth the statutory scheme that underpins Columbia’s entitlement to the easements.
A. Statutory Scheme
The Natural Gas Act provides:
When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas ... it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.
15 U.S.C. § 717f(h) (emphasis added). Accordingly, a certificate of public convenience and necessity gives its holder the ability to obtain automatically the necessary right of way through eminent domain, with the only open issue being the compensation the landowner defendant will receive in return for the easement. In 1983, FERC issued a blanket Certificate of Public Convenience and Necessity (the “FERC Certificate”) to Columbia that covers Line 1655. Columbia’s FERC Certificate states that Columbia is “authorized to conduct many routine activities and abandon facilities and service on a self-implementing basis without further authorization by the Commission.” (App.104.) (emphasis added) In defining “routine activities,” the Certificate references 18 C.F.R. § 157.203(b). This regulation provides that blanket certificate holders have automatic authorization to engage in transactions described in certain other provisions, including 18 C.F.R. § 157.208(a), which states, in relevant part:
If the project cost does not exceed the cost limitations set forth in column 1 of Table I, under paragraph (d) of this section, or if the project is required to restore service in an emergency, the certificate holder is authorized to make miscellaneous rearrangements of any facility, or acquire, construct, replace, or operate any eligible facility.
18 C.F.R. § 157.208(a) (emphasis added). Costs limitations are not an issue in this case.[4] Thus, if Columbia is replacing an *305 “eligible facility,” this constitutes a “routine activity” and Columbia can conduct this activity on a “self-implementing basis without further authorization by the Commission.” (App.104.)[5]
It is important to note that if Columbia Gas did not have a blanket certificate, and instead merely possessed a certificate of public convenience and necessity authorizing construction of a mainline, for instance, it would be able nonetheless to construct or extend facilities “which constitute the replacement of existing facilities that have or will soon become physically deteriorated or obsolete, to the extent that replacement is deemed advisable, if ... [t]he replacement facilities ... will be located in the same right-of-way or on the same site as the facilities being replaced....” 18 C.F.R. § 2.55(b)(1); 15 U.S.C. § 717(f)(c)(l)(A). This provision is an exemption that relieves natural gas companies from the requirement of having to obtain a certificate of public convenience and necessity.
However, with the instant blanket certificate of public convenience and necessity, authorizing routine activities on a self-implementing basis, Columbia is not limited to replacing within the same right of way, pursuant to Section 2.55(b). Instead, as noted above, it can engage in any routine activity without further authorization including generally “replacing] ... any eligible facility.” 18 C.F.R. § 157.208(a). The issue becomes: is Columbia replacing an “eligible facility”? If so, it needs no further authorization.
Section 157.202(b)(2)(i) defines an “eligible facility” as including “main line, lateral, and compressor replacements that do not qualify under § 2.55(b) of this chapter because they will result in an incidental increase in the capacity of main line facilities, or because they will not satisfy the location or work space requirements of § 2.55(b).” Thus, by definition, this provision includes the replacement of facilities that cannot “be located in the same right-of-way or on the same site as the facilities being replaced.” 18 C.F.R. § 2.55(b)(ii). Accordingly, by their terms, Sections 157.203(b) and 157.208(a) specifically and automatically authorize the main line replacement at issue here as a routine activity in connection with an eligible facility that cannot be located in the same right of way or same site, which Columbia Gas has the right to “self-implement[ ]” without further authorization from FERC. (App. 104.)
Though not disputed here, even the right of blanket certificate holders to replace eligible facilities is not without limits. The Dissent points out four such checks: a reporting requirement, a notice requirement, an environmental-impact-statement requirement, and monetary restrictions. (Dissent Op. at 329.)
Other curbs significantly restrict the nature of replacement projects. Certificate holders may not construct new “delivery points” under the guise of replacement. 18 C.F.R. § 157.202(b)(2)(ii)(E). Also, in general, “Replacements for the primary purpose of creating additional main line capacity are not eligible facilities” under blanket certificate authority. Id. § 157.202(b)(2)®. That is, “Replacements must be done for sound engineering purposes.” Id. In clarifying this stricture, FERC “underscore^]” that “there must be a physical need to replace facilities,” such that gas companies may not circumvent the general requirements for new *306 pipeline construction simply by designating it “replacement.” Revision Of Existing Regulations Under the Natural Gas Act, 64 Fed.Reg. 54522, 54527 (Sept. 29, 1999) (codified at 18 C.F.R. 157). FERC also encourages the enforcement of such regulations through the filing of complaints against companies that falsely claim the need to replace pipelines. Id. Again, none of these limitations are at issue here; Appellees do not challenge, for instance, that Line 1655 is being replaced for sound engineering reasons. But the regulations ensure that gas companies do not possess unfettered discretion in constructing and siting replacement pipelines.
B. The District Court’s Opinions
In October 2013, the District Court granted the Landowners’ motions for summary judgment, holding that Columbia did not have the right of eminent domain. The Court reached this conclusion by turning to one dictionary definition of the word “replace,” and using it to read an adjacency requirement into Part 157. In relevant part, the Court stated:
Columbia Gas’s contention ... is that its certificate automatically authorizes relocation of replacement Line 1655 literally anywhere on earth, so long as the replacement “will not satisfy the location or work space requirements of § 2.55(b).” But this interpretation of the regulations puts an excessively expansive gloss on the common meaning of “replace,” see Webster’s Third New International Dictionary, Unabridged, s.v. “replace,” accessed October 23, 2013, http://unabridged.merriam-webster.com (“1: to place again: restore to a former place, position, or condition”), a term that generally does not imply significant relocation. Moreover, Columbia Gas’s interpretation is seemingly contrary to the structure of the regulations, which equate the “relocation of existing facilities” with another defined term, “miscellaneous rearrangement,” see 18 C.F.R. § 157.202(b)(6), ■ not with “replacement ],” see 18 C.F.R. § 157.202(b)(2)(i). The meaning of “replacements that do not qualify under § 2.55(b),” is, at best, ambiguous as it relates to Columbia Gas’s replacement Line 1655.
(App.32-33.) Having created this ambiguity, the District Court turned to a notice of proposed rulemaking issued by FERC in 2003 in connection with emergency construction of natural gas pipelines after 9/11. The Court viewed the notice of proposed rulemaking as “a fairly definitive interpretation” of the replacement provision contained in Part 157. (App.33.)
The notice was issued in order to “give pipeline companies greater flexibility to reconstruct pipelines during emergencies caused by ‘deliberate effort[s] to disrupt the flow of natural gas.’” (App. 33 (citations omitted).) It states, in pertinent part:
[P]art 157, Subpart F, permits replacement construction that uses temporary workspace beyond the bounds of the temporary workspace previously used to construct the original facilities as necessary to install replacement facilities. These regulations also permit locating a portion of mainline, lateral, or compressor replacement facilities outside, but presumably adjacent to, an existing right-of-way where, for whatever reason, the new facilities could not be placed entirely within the original facilities’ existing right-of-way. These regulations, however, do not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster if immediate replacement is necessary before the original site is again available.
*307 Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act, 68 Fed.Reg. 4120, 4122 (proposed Jan. 17, 2003) (to be codified at 18 C.F.R. 157) (emphasis added).[6]
The District Court read the Notice as imposing an “adjacency” requirement onto any replacement of a pipeline made under Part 157. The Court then also determined that since the replacement pipeline would be “approximately a quarter-mile distant” from the existing pipeline and thus, did not align with its definition of “replace” that required the same location, it could not “be properly characterized as [a] ‘replace[ment]’ of an ‘eligible facility.’ ” (App.36.)
On November 22, 2013, however, FERC issued a Final Rule implementing changes to certain portions of Part 157 of Title 18 of the CFR, which governs the instant case.[7] The Final Rule included a footnote in which FERC identified a fact pattern essentially identical to the one at issue here — that is, whether a company can rely on its blanket certificate to replace the capacity of a segment of an obsolete pipeline with a new pipeline that may need to be located a considerable distance from the old pipeline. (See App. 1042.) In it, FERC specifically states that Part 157 allows for such replacement even where the replacement is not adjacent to an existing right of way: *308 Revisions to Auxiliary Installations, Replacement Facilities, and Siting and Maintenance Regulations, 78 Fed.Reg. 72794, 72805 n. 78 (Dec. 4, 2013) (to be codified at 18 C.F.R. §§ 157 & 380) (emphasis added). Effectively, FERC repudiated the District Court’s interpretation of the regulation at issue.
*307 “[wjhile the Commission has indicated previously that it is contemplated that replacement facilities constructed under blanket authority would usually be located adjacent to, if not within, an existing right-of-way, sections 157.202(b) (2) (1) and 157.210 permit the construction of non-main line facilities and main line facilities, respectively, without restriction on their location.”[8]
*308 On December 13, 2013, Columbia filed Rule 59(e) Motions to Alter the Judgment of the District Court based on FERC’s recently issued Final Rule. On May 20, 2014, the District Court denied Columbia’s Motions to Alter, holding that the footnote in FERC’s Final Rule was not entitled to deference under Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (holding that deference is owed to an agency’s interpretation of its own ambiguous regulation). The District Court described FERC’s Final Rule as an “about-face” (App.54) and explained that under Christopher v. SmithKline Beecham Corporation, it was not entitled to deference because it conflicted with FERC’s prior interpretation of Part 157, as set forth in the Notice of Proposed Rulemaking, and therefore did “not reflect the fair and considered judgment of the agency.” (App.56); see also Christopher, — U.S. —, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (Auer deference does not apply where “there is reason to suspect that the agency’s interpretation does not reflect the agency’s fair and considered judgment on the matter in question,” such as where “the agency’s interpretation conflicts with a prior interpretation”) (internal quotation marks omitted). Consequently, the District Court denied the motion and reaffirmed its prior opinion denying Columbia’s right of eminent domain.
Columbia challenges the District Court’s orders relating to the motions for summary judgment, the motions to alter, and the motions for preliminary injunctions. We address each matter in turn below.
II. Discussion[9]
A. The Motions for Summary Judgment
“Our review of the grant or denial of summary judgment is plenary, and we apply the same standard as the district court.” Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir.2013) (internal quotation marks omitted). Summary judgment is appropriate where “drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 322 n. 2 (3d *309 Cir.2005) (internal quotation marks omitted). In reviewing cross-motions for summary judgment, we view the facts contained in each motion in the light most favorable to the nonmoving party. Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir.2014).
We will reverse the District Court’s orders granting the Landowners’ motions for summary judgment and denying Columbia’s motions for partial summary judgment because the Court erred in reading an adjacency requirement into the provision regarding replacement pipelines in Part 157 of FERC’s regulations. The regulations are unambiguous. Section 157.202(b)(2)(i) defines an “eligible facility” as including “main line, lateral, and compressor replacements that do not qualify under § 2.55(b) of this chapter because they will result in an incidental increase in the capacity of main line facilities, or because they will not satisfy the location or work space requirements of § 2.55(b).” Section 2.55(b) covers replacement facilities that “will be located in the same right of way or on the same site as the facilities being replaced, and will be constructed using the temporary work space used to construct the original facility.” Therefore, a mainline replacement, as in the case of Line 1655, is an eligible facility under Part 157 and covered under Columbia’s certificate, by definition, because it involves construction outside of the existing right of way.
The District Court erred in adopting its own definition of “replace” as meaning putting something back in the same place. The meaning of “replace,” as commonly understood, is not so limited. One replaces electrical wiring in a house, for example, by removing worn out or obsolete wires and putting in new ones, even if the new wires are routed differently from the original wires. The District Court, and the Dissent, omit the most relevant definitions of the word “replace”:
2: to take the place of: serve as a substitute or successor of: succeed, supplant <the saw and sawmill rapidly replaced the ax ... >
4: to fill the place of: supply an equivalent for <a broken toy should not be immediately replaced ... >
Webster’s Third New International Dictionary 1925 (3d ed.1993). Put simply, in common parlance, “replace” can mean to substitute for, or it can mean to literally re-place, to put back in the same position. Because the regulations here concern replacing old pipeline, i.e., substituting new for old, the former definition is the only appropriate one. That definition of replace, to provide an equivalent or substitute, contains no inherent adjacency requirement. Accordingly, the District Court’s and the Dissent’s, reading injects ambiguity into the regulation where none exists. The District Court should have ended its analysis by concluding that the regulations unambiguously permitted Columbia to complete the replacement of Line 1655 outside the existing right of way with its existing FERC certificate.
The District Court and our dissenting colleague would have a replacement not be a replacement, but rather a “relocation” if constructed in a different place than the original pipeline. But how can this square with Section 157.202(b)(2)(i), which allows for “replacements” outside the existing right of way, so long as the gas company holds a blanket certificate of public convenience and necessity?
More importantly, however, the definition of “replace” put forward by the District Court, and now described as the “better reading” by our dissenting colleague, (Dissent Op. at 320), is simply incompatible *310 with the statutory scheme and therefore not a reasonable interpretation of the word’s meaning in this context. The Dissent agrees with the District Court in concluding that the word “replace” should be read in the regulation to mean, to “restore to a former place, position, or condition.” (Dissent Op. at 320). Finding this definition to be favorable, the Dissent argues that “[t]he fact that there are at least two ways of understanding the word ‘replacement’ shows that it is ambiguous.... ” (Dissent Op. at 321.) In fact there is no ambiguity because the definition proposed by the Dissent is inapplicable here for two reasons.
First, as noted above, using the definition of “replace” supplied by the Dissent would render portions of the statute nonsensical. Even the Dissent notes that, “sound principles of interpretation ‘dictate that a regulatory scheme should be read as a whole, so that effect is given to all its provisions.’ ” (Dissent Op. at 319.). (quoting Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm’n, 515 F.3d 247, 254 (3d Cir.2008)). In determining whether a statute is ambiguous, we:
account for both the “specific context in which ... language is used” and “the broader context of the statute as a whole.” A statutory “provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.”
Utility Air Regulatory Group v. E.P.A., — U.S. —, 134 S.Ct. 2427, 2442, 189 L.Ed.2d 372 (2014). If “replace” were limited to restoring to a former place or position, why would Section 2.55(b) specify that it applies only to replacements “located in the same right-of-way or on the same site as the facilities being replaced”? Similarly, Section 157.202(b)(2)(i) defines an “eligible facility,” inter alia, as a replacement that “will not satisfy the location or work space requirements of § 2.55(b),” that is, a replacement that is situated outside the position of the previous pipeline. This conclusively proves that the plain meaning of replace in this context is not to restore to a former place or position.
If we were to apply the Dissent’s suggested definition of the word “replace” to the regulation, the result would be absurd — a replacement could never occur under Part 157 in the situation contemplated. Where a replacement facility cannot be “located in the same right-of-way or on the same site as the facilities being replaced,” 18 C.F.R. § 2.55(b), it clearly cannot take the former place or position of the replaced facility. Finally, the Dissent’s definition would contravene Section 157.202(b)(ii)(B), which states that an “Eligible facility does not include ... [a]n extension of a main line, except replacement facilities covered under § 157.202(b)(2)(i).” Thus, far from requiring replacements to take the place of the old pipeline, the regulations explicitly recognize that replacement pipelines may properly result in extensions of a main line.[10]
Second, a clear understanding of the definition adopted by the District Court *311 and the Dissent shows its inapplicability to the statutory context here. To “restore” an object to a “former place,” (Dissent Op. at B20) necessarily implies that the object previously occupied a certain position, and that same object is being returned to that position. Another way to understand this definition is by considering “replace” to mean literally “re-place,” whereby an object is removed, possibly modified, and returned to its original location. For instance: “after dusting the vase, she replaced it on the shelf’[11]; “[rjeplace your boots on your bare feet, and paddle across waterway with well-protected feet” [12]; “replaced the card in the file.” [13]
In other words, an object is placed back in its former location.[14] One cannot place back something which never was placed in that position to begin with. Thus, the Dissent’s definition necessarily allows Columbia only to place the same pipeline back again in its former location. Accordingly if Columbia installed a new pipeline as part of a replacement project, even in the original right of way, it would automatically be in violation of the certificate, because it would not be “replacing” a pipeline back to its original site, i.e., it would not be “restoring” any pipe to its “former” position. Thus, the definition favored by the District Court and Dissent is so stringent as to be absurd and cannot govern here.[15]
The District Court also erred in relying on FERC’s post-9/11 notice of proposed rulemaking, . as requiring that replacements must be adjacent to replaced pipelines. This notice concerned the previously unaddressed situation of the restoration of gas service in the aftermath of a disaster. A close examination of the language of the notice makes manifest the error of relying on it as imposing or confirming an “adjacency” requirement in the law. For example, it states that replacement facilities contemplated under Part 157 would be “outside, but presumably adjacent to, an existing right of way.” Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act, 68 Fed. Reg. at 4122 (emphasis added). There is nothing controversial or new in this statement. A replacement pipeline would “presumably” be adjacent to an existing pipeline for a number of practical reasons— cost, environmental permitting limitations, capacity requirements, and convenience. This does not mean, however, that a replacement pipeline is required to be adjacent to an existing right of way. The other sentence noted by the Dissent is similarly inconclusive: “[tjhese regulations, however, do not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster....” Id. *312 (emphasis added). Again this is dicta, but even more it states the obvious: regulations that speak to replacing “physically-deteriorated or obsolete” pipeline indeed might not be viewed as “contemplating” completely changing the location of a totally obliterated pipeline to circumvent a disaster.[16] Nowhere does the Notice of Proposed Rulemaking state that replacement pipelines, in a non-emergency context, must be located adjacent to the original right of way.[17]
The Notice of Proposed Rulemaking, in any event, is entirely consistent with the plain text of the regulations, authorizing replacements by certificate-holders outside the right of way without any explicit adjacency requirement. Indeed, the Final Rule established that FERC views its regulation the same way. Accordingly, we need not even consider principles of deference where the regulation is unambiguous. See Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (“Auer deference is warranted only when the language of the regulation is ambiguous.”) The regulation speaks for itself, such that Columbia is entitled to the easements necessary to complete the replacement of Line 1655. The District Court erred in concluding otherwise.
For its part, the Dissent contends that (1) the regulations are ambiguous because of the different possible meanings of “replace”, (2) the Notice of Proposed Rule-making is “plainly in opposition” to the Final Rule, and (3) therefore the Final Rule is not entitled to Auer deference. (Dissent Op. at 325-26); Christopher v. SmithKline Beecham Corp., — U.S. —, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (noting that Auer deference may not be appropriate where an “agency’s interpretation conflicts with a prior interpretation ....”) Even putting aside the fact that the meaning of “replace” is unambiguous, as noted above, the caveats, vague language, and highly specific nature of the situation dealt with in the Notice of Proposed Rulemaking establish that there is no conflict with the Final Rule. Further, *313 the Final Rule itself recognizes, and perfectly harmonizes with, the language of the previous Notice: “[w]hile the Commission has indicated previously that it is contemplated that replacement facilities constructed under blanket authority would usually be located adjacent to, if not within, an existing right of way, sections 157.202(b)(2)(l) and 157.210 permit the construction of non-main line facilities and main line facilities, respectively, without restriction on their location.” 78 Fed.Reg. at 72805 n. 78 (emphasis added).
Even if we were to assume that the regulations are ambiguous, the interpretation of the Final Rule would still control. That is because the Final Rule is fully consistent with the Notice, and, as an agency interpretation of its own regulation, it is deserving of deference. Decker v. Nw. Envtl. Def. Ctr., — U.S. —, 133 S.Ct. 1326, 1337, 185 L.Ed.2d 447 (2013) (“It is well established that an agency’s interpretation need not be the only possible reading of a regulation — or even the best one — to prevail. When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent with the regulation.”) (internal quotations omitted). Thus, even if we accepted the Dissent’s purported ambiguity in the regulations, FERC’s interpretation in the Final Rule should control, and Columbia would remain entitled to the sought easements.
The Dissent also claims that the Final Rule is simply a “post hoc rationalization” on the part of FERC, and therefore not deserving of Auer deference. (Dissent Op. at 324.) We acknowledge that Auer deference may not be appropriate where an interpretation constitutes a “ ‘post hoc rationalizatio[n]’ advanced by an agency seeking to defend past agency action against attack.” Christopher, 132 S.Ct. at 2166 (emphasis added). But in this case, there is no past agency action that FERC is seeking to defend. Columbia simply replaced its pipeline under its blanket certificate outside the original right of way, and FERC later made clear in the Final Rule that Columbia had the authority under the applicable regulations to do so. FERC is not a party to this action, nor does it have any reason to favor Columbia’s interpretation over the Landowners’, but, we submit, only desires to make clear what the regulations provide. The Final Rule accordingly should not be read as any type of post-hoc rationalization.
In the end, the Dissent’s reading appears to be aimed primarily at avoiding what it perceives to be constitutional problems, namely “a grant of limitless authority.” (Dissent Op. at 331.) As set forth above, blanket certificate-holders do not possess unfettered discretion to replace pipeline. They are constrained by cost limitations, here waived by FERC because of Columbia’s good faith attempts at compliance, as well as notice requirements and environmental impact.[18] Further, replacements may not be installed simply because a company wishes to increase a pipeline’s capacity. Rather, such projects may only be undertaken for “sound engineering purposes.” 18 C.F.R. § 157.202(b)(2)®. Appellees do not claim that the replacement project was undertaken for anything other than “sound engineering purposes.” Further, even if constitutional issues might be implicated in a facial challenge, that would be an issue for another case, but that is not this case. We note that this constitutional argument was never raised by Ap *314 pellees, has not been briefed, and therefore is not properly before us.
Lastly, the Landowners argue that the “miscellaneous rearrangement” provision of Part 157 limits Columbia’s ability to replace the pipeline. This is incorrect. “Miscellaneous rearrangement” is defined, in part, as “any rearrangement of a facility, excluding underground storage injection/withdrawal wells, that does not result in any change of service rendered by means of the facilities involved, including changes in existing field operations or relocation of existing facilities.” 18 C.F.R. § 157.202(b)(6). The Landowners claim that such a relocation may only take place “[o]n the same property.” Id. § 157.202(b)(6)®. As the District Court noted, however, Section 157.202(b)(6) lists the “three characteristics of ‘miscellaneous rearrangements’ in the disjunctive.” (App.37.) Thus a relocation may take place on the same property, or it could occur, inter alia, “[w]hen required by ... encroachment of residential, commercial, or industrial areas.” Id. § 157.202(b)(6)(h).
But this is beside the point. The fact that the “miscellaneous rearrangement” provision contemplates a scenario in which a pipeline must be “relocated ” due to encroaching residential developments actually only goes to show that this is referring to a relocation, and not a replacement. Thus, “relocation,” as used here, involves moving an existing entity to a new location, whereas “replacement” would involve a substitution of new for old. Accordingly, Section 157.208(a) treats “miscellaneous rearrangements” as something different from “replacements” of eligible facilities. Here, Columbia does not seek to move the existing pipeline to a new location. Rather, Columbia will construct a new facility to serve in place of the deteriorating one. Thus, as Columbia argues, it is replacing Line 1655, not relocating it.[19]
Under the plain language of FERC’s regulations, Columbia is automatically authorized to replace Line 1655 according to its proposed plan. Pursuant to its FERC Certificate, Columbia has the right of eminent domain over the easements that it seeks from the Landowners. Accordingly, we will reverse the orders of the District Court granting the Landowners’ motions for summary judgment and denying Columbia’s motions for partial summary judgment.[20]
B. Motions for Immediate Possession
Columbia argues that we should grant it immediate possession of the easements by entering preliminary injunctions. It urges that further delay will be harmful to it and the public. If it is not able to begin replacement of Line 1655 until the determination of just compensation, the timely completion of the project will be jeopardized. The District Court’s ruling that Columbia had not established the right to condemn the necessary easements obviously doomed Columbia’s request. Given our ruling that recognizes Columbia’s right of eminent domain, the issue of the preliminary injunction is properly before us. We *315 believe that we can easily decide this issue in the first instance, such that remand, with its attendant delay, is unnecessary. This is not a “normal” preliminary injunction, where the merits await another day. In those situations, the probability of success is not a certainty such that weighing the other factors is paramount. Here, there is no remaining merits issue; we have ruled that Columbia has the right to the easements by eminent domain. The only issue is the amount of compensation— which will definitely be determined on remand, but the result of which can have no affect on Columbia’s rights to the easements. That Columbia’s entitlement to relief comes in the form of injunctive relief should not dictate that we impose similar constraints on our grant of that relief in this context. Nonetheless for the sake of completeness and because the District Court and Dissent seek to limit Columbia’s entitlement we will examine the other factors. We believe they weigh in favor of granting the preliminary injunctions to which Columbia is entitled.
In determining whether a party is entitled to a preliminary injunction, we normally consider four factors: “(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.” Am. Express Travel Related Servs. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir.2012) (internal quotation marks omitted).
Having already determined that Columbia has succeeded on the merits, we now examine whether Columbia will suffer irreparable injury if it is denied relief. Columbia explains that pipeline construction season is relatively short and late to begin — the weather from November through February generally makes construction impractical and expensive.[21] Columbia states that if construction on the properties does not begin by now (actually September 1, 2014), weather events could have a significant disruptive effect and potentially delay the replacement of the pipeline until 2015. Columbia explains that there are safety concerns associated with an aging, unreliable pipeline, and that delay in possession of the easements will likely cause it to miss the in-service deadline in time for the beginning of the heating season on November 1, 2014. If Columbia misses the in-service deadline, it will lose the right to seek reimbursement from its customers. Thus the harm to Columbia appears to involve its safety, reputation, and economic interests.
Columbia points to the Fourth Circuit’s opinion in East Tennessee Natural Gas Company v. Sage, 361 F.3d 808 (4th Cir.2004), in arguing that a preliminary injunction is warranted where a delay in construction of a pipeline would cause “significant financial harm” to both a gas company and its customers. Id. at 828-29. The Fourth Circuit explained that East Tennessee Natural Gas Company would be forced to breach certain contractual obligations if it were forced to delay construction in order to hold hearings on just compensation. Id. The Landowners argue that Sage is inapposite because Columbia has not shown that it will lose more than *316 $5 million (which was the estimated loss in Sage). The Landowners also point to Third Circuit precedent stating that “a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement,” except where “the potential economic loss is so great as to threaten the existence of the movant’s business.” Minard Run Oil Co. v. United States Forest Serv., 670 F.3d 236, 255 (3d Cir.2011) (internal quotation marks omitted). Although Columbia has not cited a specific dollar amount for the financial harm it faces were we to deny relief, the harm alleged is not one of “purely economic injury.” Here, there are also safety and potential liability concerns caused by an inability to meet the heating deadline.
Moreover, the harm to the Landowners that will result if we grant Columbia’s preliminary injunctions is minimal. Since we have already determined that Columbia has the right of eminent domain, it is a certainty that the requested easements will be granted. The Fifth Amendment also guarantees that the Landowners will be justly compensated. The Landowners have not stated any concrete injury other than the loss of the easements over their land, which will definitely occur, whether or not we grant Columbia immediate possession of the easements.
Finally, we examine the public interest involved in Columbia’s obtaining relief — it is this factor that overwhelmingly weighs in favor of granting Columbia’s prehminary injunctions. The Landowners state, summarily, that “while the public does have an interest in the pipeline being replaced for safety reasons, an additional delay in replacement of Line 1655 will not result in any substantial harm to the public.” Landowners’ Br. 35. Columbia has explained, however, that the safety risks associated with a delay in the replacement work and acquisition of the easements will increase daily. In his affidavit, Jacob Frederick elaborated upon the safety risks: “the Pipeline may fail, collapse, explode, or leak, causing bodily and property injury or death and/or leaving the residents of York County without gas service.” (Frederick Aff. 3.) In addition to these safety concerns, Columbia has made it clear that the residents of York County could possibly be without heat the entire winter if construction of the replacement does not begin soon.
Weighing all of the relevant factors, we conclude that Columbia is entitled to injunctive relief and therefore will be granted immediate possession of the easements.
III. Conclusion
In sum, we will reverse the orders of the District Court (1) granting the Landowners’ motions for summary judgment, and (2) denying Columbia’s motions for partial summary judgment and for preliminary injunctions. We will dismiss the appeal of the order concerning the motions to alter as moot. Finally, we will remand to the District Court to enter the prehminary injunctions and conduct further proceedings.

. The District Court stated that the replacement pipeline would be one quarter of a mile from the original but the Landowners counter that the replacement pipeline will be "up to a mile away.” (App.15.) The actual distance between the replacement pipeline and the existing pipeline is not clear from the record, but because using the greater distance does not change our position with respect to the appeal, we will assume that it is correct.

. Columbia also appeals the judgment of the District Court with respect to a motion for reconsideration (or a "motion to alter”) it filed on December 13, 2013. Because we will reverse the District Court on the motions for summary judgment, the appeal of the order concerning the motion ■ for reconsideration will be moot.

. The Dissent makes the claim that Columbia "threatened” the Landowners. (Dissent. Op. at 317-18.) This is a sensationalist reading of Columbia’s statement that its offers were higher than the fair market value of the land, and has no basis in the record.

. As relevant here, gas companies holding a certificate, relying on Section 157, must provide notice to FERC and an environmental impact statement for any replacement construction project, unless the costs are less than $11 million. 18 C.F.R. § 157.208(a)-(b), (d). Columbia had originally budgeted the replacement for Line 1655 at $10.6 million, but encountered additional costs in the form of condemnation proceedings. (App.1412-13.) Accordingly, Columbia requested a waiver of the $11 million cost cap from FERC. The agency concluded that: “[I]t appears that Columbia made a good faith effort to construct the replacement project under the guidelines and cost limits set forth in section 157.208(d) of the Commission’s blanket certificate regulations. Based on the specific facts and circumstances of this project, waiver of cost limitations in this instance is granted.” (App. 1413.)

. The Dissent urges that some notice or process should accompany this type of activity by certificate holders, in order to avoid constitutional problems. That argument is best made to Congress — or in the next case. It has not been raised in the case before us.

.The District Court also commented on other portions of the 2003 notice regarding Part 157:
The agency repeated this general idea a number of times: "part 157 ... does not permit the extensive deviation from an existing right-of-way that would presumably be necessary to circumvent a restricted or quarantined area,” "[part 157] was broadened incrementally in 1999 to [allow] mainline replacements ... that ... did not lie within the original facilities’ footprint, and consequently were outside of the section 2.55(b) replacement parameters ... [but] this modification in the breadth of eligible facilities did not contemplate the more extensive rerouting that would be required to reach around a cordoned accident area,” [the 1999 broadening of part 157] recognized the need to grant natural gas companies the flexibility to act under blanket certificate authority to replace facilities where construction of new facilities might spill over the original temporary workspace or permanent right-of-way ... [but did not] envision[] replacement of facilities outside the existing right-of-way by the creation of an entirely new route due to the need to circumvent an accident site.
(App. 34-35 (citations omitted).)

. This Final Rule has nothing to do with the Notice of Proposed Rulemaking previously discussed that was referred to by the District Court.

. In full, the footnote reads:
We note that in instances where a pipeline company needs to rely on its Part 157 certificate to construct auxiliary or replacement facilities because they do not satisfy the location or work space limitations of section 2.55, the Part 157 blanket certificate regulations impose no limitations on the placement of the facilities. While the Commission has indicated previously that it is contemplated that replacement facilities constructed under blanket authority would usually be located adjacent to, if not within, an existing right-of-way, sections 157.202(b)(2)(l) and 157.210 permit the construction of non-main line facilities and main line facilities, respectively, without restriction on their location. For example, a company can rely on its Part 157 blanket *308 certificate to replace the capacity of a segment of obsolete pipeline with new pipeline that may need to be located at considerable distance from the old pipeline in order to avoid a housing development constructed since the old pipeline was installed or to install auxiliary facilities such as anodes offset from the existing right-of-way to provide cathodic protection.
Revisions to Auxiliary Installations, Replacement Facilities, and Siting and Maintenance Regulations, 78 Fed.Reg. 72794, 72805 n. 78 (Dec. 4, 2013) (to be codified at 18 C.F.R. §§ 157 & 380). The Dissent notes the promulgation of this Final Rule closely following the District Court’s decision as if this is problematic. To the contrary, we view the Final Rule as FERC’s specific, reasonable rebuttal to what it viewed as a total misreading of the regulations governing its operation. See Christopher v. SmithKline Beecham Corp., — U.S. —, 132 S.Ct. 2156, 2166-67, 183 L.Ed.2d 153 (2012) (noting that "Auer ordinarily calls for deference to an agency’s interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief.... ”).

. The District Court had jurisdiction under 28 U.S.C. § 1331 and the Natural Gas Act, 15 U.S.C. § 717f(h). We have jurisdiction pursuant to 28 U.S.C. § 1291.

. Perhaps recognizing these points, the Dissent argues that it is not claiming that the pipeline must be replaced in "exactly the same spot.” (Dissent Op. at 320.) This contradicts its chosen definition, however. One cannot both claim that replace means to restore to the same place or position, and that it means to install in a different place or position. And once one acknowledges that a replacement, i.e. substitute, might well occupy a different location from the thing it has replaced, as we well agree, there is no inherent limit in the word "replace” as to where a replacement may be situated.

. Replace, Cambridge Dictionaries Online, http://dictionaiy.cambridge.org/us/dictionary/ american-englisb/replace (last visited September 12, 2014).

. Replace, Oxford English Dictionary, http:// www.oed.com/view/Entiy/162819?rskey=Bb M3iQ&result=2&isAdvanced=false (last visited September 12, 2014).

. Webster’s Third New International Dictionary 1925 (3rd ed.1993).

. While the Dissent accuses us of "cheriypickfing]” these examples, we cite them simply as representative uses of the word "replace” when used in the sense of restoring to a former place. (Dissent Op. at 320 n. 6.) If there is another way of employing the word in this context, we have not encountered it and the Dissent does not supply it.

.Instead, “replace” in the broad sense of "to furnish an equivalent or substitute” controls “especially” in the case when referring to something that "has been lost, depleted, worn out, or discharged....” American Heritage Dictionary of the English Language 1479 (4th ed.2009).

. The notice dealt specifically with emergencies such as a “sudden unanticipated loss of natural gas or capacity,” not deteriorating pipelines. 68 Fed.Reg. at 4120. Presumably FERC wanted to make clear that whether existing lines were rendered inoperable or were totally destroyed due to a disaster, rerouting was permissible. One cannot fault FERC for wanting to cover all bases in such a situation, lest someone contend that "replacement” in the existing regulations applied only to the routine replacement of pipelines that "have or will soon become physically deteriorated or obsolete____” 18 C.F.R. § 2.55(b)(1).

. Indeed, FERC did not impose an adjacency requirement in adopting that portion of Section 157.202(b)(2)(i) which allows replacement construction outside the original right of way. In the relevant Final Rule, several comments had "argue[d] that replacements not in the same ROW [right of way] should be covered under the blanket certificate instead of requiring a separate § 7(c) application.” Revision of Existing Regulations Governing the Filing of Applications for the Construction and Operation of Facilities To Provide Service or To Abandon Facilities or Service Under Section 7 of the Natural Gas Act, 64 Fed.Reg. 26572, 26580 (May 14, 1999) (codified at 18 CFR 157). Accordingly, one such comment proposed the clause that was subsequently codified, allowing construction outside the previous right of way. FERC thus agreed with the comments, stating broadly that: "We intend to allow replacement facilities that do not qualify under § 2.55(b) because of land requirements to be eligible facilities that can be constructed under § 157.208 of the blanket certificate. Further, to the extent that pipelines require more ROW than is provided for in appendix A to part 2 for replacement projects, including those not in the original footprint, such as river crossings, etc., those replacements would qualify as eligible facilities under our proposal.” Id. The only caveats noted by FERC were that such replacements were subject to environmental restrictions and landowner notice provisions.

. And, Columbia would appear to be constrained in replacing outside the existing right of way by the extra costs of doing so, including costs of negotiation and or litigation with landowners.

. The Landowners, in their brief, argued that Columbia seeks an "extension” of its pipeline requiring it to acquire a new certificate authorizing the project, pursuant to 15 U.S.C. § 717f(c)(l)(A). (Landowners' Br. at 11.) At oral argument, however, the Landowners conceded that Columbia does not seek an extension of its pipeline. We therefore do not address this argument.

. Having determined that the District Court erred in its disposition of the motions for summary judgment, we will dismiss the appeal of the Court’s judgment on the motions to alter as moot.

. Columbia has submitted two affidavits in support of its motions for immediate possession — the affidavit of Doug Holley (former Manager of Asset Management for Columbia Gas and current Vice President of Projects for Contract Land Staff, which was hired by Columbia Gas to assist it in acquiring the easements for Line 1655) and the affidavit of Jacob Frederick (Manager of Project Management for Columbia Gas).